**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WISCONSIN CENTRAL LTD., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | No. 16-cv-04271 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| SOO LINE RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In October 1987, Wisconsin Central Ltd. ("WCL") and Soo Line Railroad Company ("Soo Line") finalized an asset purchase agreement ("APA"). Among the railroad assets purchased by WCL in the transaction was a right-of-way located in Ashland, Wisconsin. Nearly fifteen years later, the right-of-way was part of a larger area designated as a Superfund site by the Environmental Protection Agency ("EPA"). Both WCL and Soo Line later contributed to the settlement of claims related to the Superfund site. Then, pursuant to the APA, each party looked to the other to indemnify it for the amounts contributed to the settlement. Both refused and WCL filed the present breach of contract action. Along with its answer, Soo Line set forth its own breach of contract counterclaim against WCL. The parties then filed cross-motions for summary judgment. (Dkt. Nos. 47, 51.) For the reasons that follow, Soo Line's motion for summary judgment is granted and WCL's motion is denied.

# BACKGROUND[1]

## I.     Terms of the APA

On April 2, 1987, Soo Line and WCL entered into the APA whereby WCL purchased certain of Soo Line's railroad assets from its Lake States Transportation division. (Def.'s Resp. to Pl./Counter-Def.'s Rule 56.1 Statement of Undisputed Material Facts ("DRSUMF") ¶¶ 8–9, Dkt. No. 60; Pl.'s Resp. to Def./Counter-Pl.'s Rule 56.1 Statement of Undisputed Material Facts ("PRSUMF") ¶ 5, Dkt. No. 62.) Pursuant to Section 18 of the APA, Soo Line agreed to indemnify and hold WCL harmless from, among other things, "any and all liabilities and obligations of Soo [Line], except to the extent assumed by [WCL] pursuant to Section 4" of the APA and "any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs and legal and other expenses (including attorneys fees) incident to any of the foregoing." (DRSUMF ¶ 10; PRSUMF ¶ 18.) Similarly, Section 19 requires WCL to indemnify Soo Line for, among other things, "any and all liabilities and obligations assumed by [WCL] pursuant to this Agreement." (PRSUMF ¶ 20.) And Section 4 of the APA specifies certain liabilities assumed by WCL. (DRSUMF ¶ 12.)

As originally executed, Section 4 contained a provision stating that WCL assumed liability for "claims for environmental matters relating to the ownership of the Assets or the operation of [the Lake States Transportation division] arising out of the acts or omissions of parties other than Soo [Line]." (PRSUMF ¶ 8.) Following the execution of the APA, however, WCL's lenders expressed concern that WCL's assumption of environmental liabilities could potentially prevent WCL from repaying the loan financing the purchase. (*Id.* ¶ 10.) Faced with the lenders' threats to withdraw funding necessary to close the transaction, WCL and Soo Line entered negotiations to amend the APA so as to assuage the lenders' concerns. (*Id.* ¶ 11.) The APA was amended on

---

[1] All material facts are undisputed.

October 10, 1987, and the transaction closed on October 11, 1987. (DRSUMF ¶ 14, PRSUMF ¶ 12.) The amended APA revised the provision in Section 4 regarding WCL's assumption of environmental liabilities to state that WCL assumed liability for "all claims for environmental matters relating to the ownership of the Assets or the operation of the [Lake States Transportation division] that are asserted after the tenth anniversary of the Closing Date," October 11, 1987. (DRSUMF ¶ 16; PRSUMF ¶ 13.) Another provision within Section 4 was also amended to state that WCL did not assume liability for any "claims for environmental matters relating to the ownership or operation prior to the Closing Date of the Operating Rail Property . . . asserted on or prior to the tenth anniversary of the Closing Date." (DRSUMF ¶ 15; PRSUMF ¶ 13.) Thus, as amended, Section 4, in conjunction with Section 18, requires Soo Line to indemnify WCL for all claims for environmental matters asserted by third parties between October 11, 1987 and October 11, 1997 (the "WCL Claim Period"), along with any demands, claims, actions, suits, proceedings, assessments, judgments, costs, and legal and other expenses incident to claims asserted during the WCL Claim Period. For claims asserted after October 11, 1997 (the "Soo Line Claim Period"), WCL must indemnify Soo Line to the extent that the claims cannot be characterized as incident to claims asserted during the WCL Claim Period.

Section 18(b) of the APA sets forth the procedures by which WCL may obtain indemnification from Soo Line:

> In the event any demands or claims are asserted against [WCL] or any actions, suits or proceedings are commenced against [WCL] for which Soo [Line] is obligated to indemnify [WCL] under this Section 18, then [WCL] shall give timely notice thereof to Soo [Line] in order to permit Soo [Line] the necessary time to evaluate the merits of such demand, claim, action, suit or proceeding and defend, settle or compromise the same so that its interests are not materially prejudiced; and, in the event [WCL] fails to provide such timely notice, Soo [Line] shall have no liability whatsoever to indemnify and defend [WCL] from such demand, claim, action, suit or proceeding pursuant to this Section 18 and [WCL] shall be solely

responsible for the defense thereof and any and all liability of [WCL] arising therefrom.

(PRSUMF ¶ 19.)[2] If WCL provides timely notice, Soo Line is required to assume the defense of any claim within ten business days of such notice. (*Id.*)

## II. The Parties' Responsibility for Contamination in Kreher Park

Among the assets purchased by WCL was Soo Line's Ashland to Spencer track, which included a portion of a railroad right-of-way located in an area of Ashland, Wisconsin colloquially referred to as Kreher Park. (DRSUMF ¶¶ 9, 34; PRSUMF ¶¶ 28, 30.) In the late 1980s and early 1990s, coal tar and related contamination was discovered in Kreher Park. (PRSUMF ¶ 28.) The suspected source of the contamination was a former manufactured gas plant owned by predecessors of Northern States Power ("NSP"). (DRSUMF ¶ 35; PRSUMF ¶ 29.) That plant was located on a bluff overlooking Kreher Park and Lake Superior, and the contamination had migrated downgradient from the plant to WCL's right-of-way, as well as Kreher Park generally and certain surrounding areas. (DRSUMF ¶ 35, PRSUMF ¶ 29.)

Beginning in late 1994, the Wisconsin Department of Natural Resources ("WDNR") communicated with NSP regarding the need to investigate and remediate the contamination in Kreher Park. (DRSUMF ¶ 38.) However, NSP was not convinced that it was solely responsible for the contamination and initiated its own investigation as to other potential contributors. (*Id.* ¶ 39.) NSP hired a private investigation firm to "identify and interview persons with knowledge about the historic operations of both the [manufactured gas plant] and the lakefront property." (*Id.* ¶ 40.) NSP provided both WDNR and WCL with summaries of its interviews along with other updates regarding its investigation. (*Id.* ¶¶ 41, 43.) By early 1995, NSP concluded that WCL and Soo Line were potentially responsible parties with respect to the Kreher Park contamination. (*Id.*

---

[2] Section 19 sets out a substantially similar procedure for instances where Soo Line seeks indemnification from WCL. (PRSUMF ¶ 21.)

¶ 43.) In February 1995, NSP wrote a letter to WDNR to provide an update on its investigation. (*Id.* ¶ 44.) NSP conveyed, among other things, that its interviews led it to believe that Soo Line and WCL had engaged in certain railroad activities that contributed to the contamination. (*Id.*) Further, NSP stated its position that "WDNR's baseline assumptions concerning potentially responsible parties needs to be revised." (*Id.*)

On March 2, 1995, WDNR issued a potentially responsible party letter to NSP notifying it of its preliminary determination that NSP was the source of the Kreher Park contamination. (DRSUMF ¶ 47; PRSUMF ¶ 29.) In response, NSP wrote to WDNR and referred to its February letter as having "identified several other sources of creosote waste and other waste disposal activities" and suggesting that WDNR "actively and thoroughly conduct an objective analysis of all data available as of this date and issue the necessary [potentially responsible party] letters to other owners and operators as soon as possible." (DRSUMF ¶ 47.) The other owners and operators to which NSP referred in that letter included Soo Line and WCL. (*Id.* ¶ 48.)

Ashland's Daily Press published an article on March 10, 1995 with the headline "NSP, [W]DNR working on waterfront clean-up." (DRSUMF ¶ 50; PRSUMF ¶ 34.) The article stated that NSP "officials say they believe liability for the clean-up could include several other companies and government entities," including WCL. (DRSUMF ¶ 50; PRSUMF ¶ 34.) WCL faxed that article to Soo Line on May 1, 1995. (PRSUMF ¶ 35.) On March 17, 1995, a consultant retained by NSP to evaluate the possibility of other potential contaminant sources at Kreher Park produced a final report documenting its efforts. (DRSUMF ¶ 52.) It concluded that the contamination "was likely caused by wood preservation operations that occurred on the property, dissolved constituents in groundwater migrating onto the property from off site (coal tars and other materials in the ravine) and waste associated with the disposal of unknown materials that

occurred for several decades on the [City's waste water treatment plant] property." (PRSUMF ¶ 36.) It also contained references to interviews of area residents who observed that "railroad cars regularly dumped tar material and/or some kind of waste in the area." (DRSUMF ¶ 62 (internal quotation marks omitted).) That report was forwarded to WCL in a letter dated April 17, 1995. (PRSUMF ¶ 36.) In mid-April 1995, NSP provided WDNR with a presentation deck in which NSP alleged that "the railroad may also have contributed waste to the site" and "other [potentially responsible parties] may include WCL." (DRUSMF ¶ 56 (internal quotation marks and alterations omitted).) The presentation stated that NSP intended to "continue to pressure WDNR to move ahead on formal [potentially responsible party] notification" to WCL and other parties. (*Id.* ¶¶ 56–57 (internal quotation marks and alterations omitted).)

NSP met with WCL at the law offices of Michael Best & Friedrich LLP ("Michael Best") in early May 1995 to share the findings from its investigation. (DRSUMF ¶ 64; PRSUMF ¶ 38.) During the meeting, NSP provided WCL with summaries of the interviews NSP had conducted and a document titled "Status Report." (*Id.*) The interview summaries contained several statements alleging that the railroads had dumped coal tar, tar waste, and other debris along the right of way. (DRSUMF ¶ 65; PRSUMF ¶ 39.) The Status Report concluded that there were other potential sources of contamination and named four specific potentially responsible parties, none of which was WCL. (PRSUMF ¶ 40.) Instead, the Status Report separately listed WCL only as an entity that may be an additional potentially responsible party. (DRSUMF ¶ 66; PRSUMF ¶ 40.) Following that meeting, WCL forwarded the interview summaries and Status Report to Soo Line. (PRSUMF ¶ 41.)

In October 1995, NSP gave WDNR a presentation titled "WISCONSIN CENTRAL LIMITED Is A Responsible Party At This Site." (DRSUMF ¶ 67.) The presentation included

witness statements that the railroad dumped oil, coal, debris, tar waste, rolls of tar, and other materials along both the right-of-way and the shoreline. (*Id.*) It closed with the conclusion that WDNR "should issue [a potentially responsible party] letter to WCL based on Successor Liability." (*Id.*) That same month, NSP's outside counsel at Michael Best wrote to WCL's in-house counsel claiming that "NSP and [WCL] may be potentially responsible parties with respect to responsibility for the funding of the costs of the investigation and remediation at Kreher Park." (*Id.* ¶ 71.) In a May 13, 1997 letter regarding the path forward on the Kreher Park contamination, NSP proposed that the project be divided into a remediation team and a liability/allocation team. (*Id.* ¶ 74.) It stated that WCL should be invited to participate on both teams as it was a party that may potentially be involved in the clean-up efforts due to both its current ownership and the historical railroad operations at the site. (*Id.* ¶¶ 74–75.)

Despite NSP's efforts and repeated requests, WDNR did not name WCL as a potentially responsible party for the Kreher Park contamination during the WCL Claim Period. (DRSUMF ¶ 73; PRSUMF ¶¶ 46–48.) Indeed, in a February 18, 1997 internal memorandum, WDNR stated that it did "not believe that any rail road spills are a significant source of the contamination." (PRSUMF ¶ 47.) Nor did NSP commence any private litigation against or make any demand from WCL with respect to the contamination during the WCL Claim Period. (*Id.* ¶ 42.)

Moreover, NSP and WCL shared the same outside counsel, Michael Best, during that period. (*Id.* ¶¶ 60, 63–64.) Michael Best had been WCL's primary outside counsel, and in 1995, NSP sought to retain the firm to represent it with respect to the Kreher Park contamination. (*Id.* ¶ 57.) However, NSP first had to request that WCL execute a consent letter allowing Michael Best to represent NSP. (*Id.*) WCL's outside counsel allowed Michael Best to represent NSP subject to two conditions: (1) Michael Best could only represent NSP in its interactions with WDNR and

could not represent NSP in any cost-recovery or contribution litigation against WCL, and (2) NSP

had to allow Michael Best to jointly represent both NSP and WCL with respect to the Kreher Park

contamination. (*Id.* ¶ 58.) Those conditions were expressly stated in a consent letter signed on

September 15, 1995. (*Id.* ¶ 60.) Michael Best further represented in that letter that "we believe

that our representation of NSP will neither adversely affect our relationship with WCL nor

adversely affect our representation of either NSP or WCL." (*Id.*) Michael Best continued as

NSP's only outside counsel on the Kreher Park matter through at least 1997. (*Id.* ¶ 64.) It

remained as WCL's counsel through 2001. (*Id.* ¶ 63.)

On November 20, 1997—after the expiration of the WCL Claim Period—WDNR did send

WCL a potentially responsible party letter with respect to solid waste at Kreher Park that is not at

issue in this action. (DRSUMF ¶ 78; PRSUMF ¶ 85.) The letter expressly stated that it should not

be taken to imply that the WDNR was asserting that WCL was "responsible for the generation,

management or disposal of coal tar or creosote in this area. The Department ha[d] no evidence

that would support such a determination." (PRSUMF ¶ 87.) In response, NSP wrote to WDNR

and expressed its concern that WDNR's letter to WCL "failed to accurately identify creosote

and/or coal tar as a contaminant of concern attributable to the railroads' historical operations at

the Kreher Park Site." (DRSUMF ¶¶ 79–80.) WCL later submitted to WDNR a "Request for No

Further Action Determination" dated July 17, 2000. (PRSUMF ¶ 90.) WDNR responded on

January 29, 2002 with a "Clarification of Environmental Liability" letter, in which it confirmed

that the "solid waste [was] what WCL received the responsible party notification for" and stated

that "no further investigation or remediation of the solid waste [was] necessary at [that] time."

(DRSUMF ¶ 107; PRSUMF ¶¶ 90–91.)

Although WDNR had not named WCL as a potentially responsible party, WCL was cognizant of the fact that NSP was aggressively trying to convince WDNR to do so. (DRSUMF ¶ 83.) Moreover, WCL's in-house counsel and Soo Line's in-house counsel were in regular communication regarding the Kreher Park contamination. (*Id.* ¶ 86.) On January 10, 1997, WCL's in-house counsel sent a letter to Soo Line notifying Soo Line of sixty-three locations for which WCL asserted that Soo Line bore all or a portion of the responsibility for environmental matters. (DRSUMF ¶ 97; PRSUMF ¶ 77.) Attached to the letter was a table listing Kreher Park as one of the locations for which WCL sought indemnification. (DRSUMF ¶ 97; PRSUMF ¶ 77.) The table stated that substantial costs were expected if litigation were to occur with respect to Kreher Park. (PRSUMF ¶ 81.) The letter was meant to be a "final sweep for Soo Line indemnification" and that was the first time WCL provided notice to Soo Line of its purported obligation to indemnify WCL for the Kreher Park contamination. (DRSUMF ¶¶ 100, 102; PRSUMF ¶¶ 77, 80.) The letter also attached another document that stated for Kreher Park that "notice is hereby given of WC[L]'s Environmental Claim for the above-referenced site. A suspected coal tar deposit in Lake Superior is being alleged by NSP with alleged involvement from property owners through the site." (PRSUMF ¶ 83.) Soo Line and WCL had several follow-up meetings regarding a settlement for all sites listed in the January 10, 1997 letter. (DRSUMF ¶¶ 98–99.)

WCL's parent company Canadian National Railway Corporation sent a letter to Soo Line on December 10, 2002 proposing to settle all environmental issues listed in an attached table, which included the Kreher Park contamination. (PRSUMF ¶¶ 100–01.) However, Soo Line never responded. Canadian National Railway Corporation sent another letter on August 27, 2007, again proposing to settle past and future environmental matters. This time Soo Line did provide a written response on October 15, 2007. (DRSUMF ¶ 99; PRSUMF ¶¶ 102–03.) In its response,

Soo Line disclaimed liability under the APA for the matters. (PRSUMF ¶ 103.) On December 9, 2008, WCL filed a lawsuit against Soo Line for breach of the APA and declaratory judgment due to Soo Line's refusal to indemnify WCL for environmental claims for sixty-three sites, including Kreher Park. (*Id.* ¶ 104.) Eventually the parties settled the lawsuit, but the settlement expressly reserved any claims or defenses related to Kreher Park. (*Id.*) The parties executed a tolling agreement on March 21, 2011 that tolled claims related to Kreher Park. (*Id.* ¶ 105.)

Around September 2002, the EPA designated the "Ashland/NSP Lakefront Site" (the "Superfund site"),[3] on the National Priorities List under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (PRSUMF ¶ 106.) The designated Superfund site encompassed Kreher Park but also covered a broader geographic area than the WDNR's earlier investigation. (*Id.*) NSP sent the EPA a "[Potentially Responsible Party] Investigation Report" dated June 20, 2006 that contained eyewitness accounts similar to those submitted to WDNR stating that Soo Line and WCL's railroad activities had contributed to the contamination in the area. (DRSUMF ¶¶ 108–109.) Again, NSP's purpose was to involve Soo Line and WCL in the investigation and remediation of the Superfund site. (*Id.* ¶ 110.) The EPA issued a Special Notice Letter to Soo Line, WCL, and other parties on April 27, 2011, advising them that they were potentially responsible parties under CERCLA for the contamination at the Superfund site. (DRSUMF ¶ 111; PRSUMF ¶ 108.) The specific contamination at issue related primarily to polycyclic aromatic hydrocarbons and volatile organic compounds from coal tar and creosote. (PRSUMF ¶ 108.) Approximately two weeks later, Soo

---

[3] CERCLA is informally called Superfund. *What is Superfund*, U.S. Envtl. Protection Agency, https://www.epa.gov/superfund/what-superfund. "A Superfund site is any land in the United States that has been contaminated by hazardous waste and identified by the EPA as a candidate for cleanup because it poses a risk to human health and/or the environment." *TOXMAP FAQ: What are the Superfund site "NPL" statuses?*, U.S. Dep't of Health & Hum. Servs., https://toxmap.nlm.nih.gov/toxmap/faq/2009/08/what-are-the-superfund-site-npl-statuses.html.

Line sent WCL a written notice seeking indemnification from WCL pursuant to the APA in relation to the EPA's Special Notice Letter. (*Id.* ¶ 109.) WCL refused to defend or indemnify Soo Line. (*Id.* ¶ 110.)

NSP filed suit against Soo Line, WCL, and several other parties on August 17, 2012, seeking, among other things, cost recovery and contribution under CERCLA, as well as a declaratory judgment allocating shares of remediation costs for the Superfund site. (DRSUMF ¶ 113; PRSUMF ¶ 112; *see N. States Power Co. v. City of Ashland, Wisc.*, 12-cv-00602 (W.D. Wisc. filed Aug. 17, 2012).) Once again, Soo Line sent WCL a written notice seeking indemnification, this time with respect to NSP's action. (PRSUMF ¶ 115.) WCL declined to defend or indemnify Soo Line for this claim as well. (*Id.* ¶ 116.) Instead, Soo Line and WCL jointly defended against both the CERCLA and NSP actions (the "Superfund claims"). (*Id.* ¶ 117.) The United States Department of Justice, on behalf of the EPA, wrote Soo Line and WCL on March 20, 2014 to describe the bases for their liability. (DRSUMF ¶ 118.) The letter stated that there was credible evidence that the railroads' "spilling or dumping of oil, coal, or tar waste from railroad equipment" and "dredging operations in Chequamegon Bay" contributed to the contamination at the Superfund site. (*Id.*)

On November 6, 2014, Soo Line and WCL executed a Consent Decree and a Settlement Agreement and Release that resolved both Superfund claims. (DRSUMF ¶¶ 119–120; PRSUMF ¶ 118.) Pursuant to the settlement, Soo Line and WCL combined paid $10.5 million to the United States, of which $6 million was paid to NSP. (DRSUMF ¶ 119.) Around the same time, WDNR, WCL, and Soo Line executed a separate agreement related to the settlement. (*Id.* ¶ 119.) In that agreement, WDNR clarified that "[c]onsistent with [WDNR's] 2002 letter to [WCL], [WDNR] has not raised claims against [WCL] or [Soo Line] nor does it intend to for liability associated

with the investigation or remediation of the [Superfund] Site or related response costs." (*Id.*)
Ultimately, WCL and Soo Line each paid approximately $5.25 million to the United States.
(PRSUMF ¶ 120.)

### III.     The Present Action

WCL filed the present action on April 13, 2016 (Dkt. No. 1), alleging that Soo Line
breached the APA when it failed to indemnify WCL for the $5.25 million it paid in accordance
with the settlement. Shortly thereafter, WCL amended its complaint to seek indemnification for
both the settlement as well as legal and other expenses it incurred in resolving the Superfund
claims. (Dkt. No. 16.) In its answer to the amended complaint (Dkt. No. 21), Soo Line asserted a
counterclaim arguing that it was WCL that breached the APA when it did not indemnify Soo Line
for its $5.25 million contribution to the settlement. The parties subsequently filed the present
cross-motions for summary judgment (Dkt. Nos. 47, 51).

In its motion for summary judgment, WCL argues that NSP asserted a claim against it
during the WCL Claim Period when NSP sought to convince WDNR that WCL was a potentially
responsible party with respect to the Kreher Park contamination. And because the Superfund
claims were incident to that initial claim, according to WCL, the APA requires Soo Line to
indemnify WCL for the amount it contributed to the settlement of the Superfund claims. On the
other hand, Soo Line argues in its motion that if a claim was asserted during the WCL Claim
Period, WCL's breach of contract action would be barred by the statute of limitations. Regardless,
Soo Line asserts that no claim was asserted until the EPA named Soo Line and WCL as
potentially responsible parties in the April 27, 2011 Special Notice Letter, which was during the
Soo Line Claim Period. Thus, Soo Line contends that it should be granted summary judgment on
its counterclaim because WCL breached the APA when it refused to indemnify Soo Line for Soo

Line's contribution to the settlement of the Superfund claims. Furthermore, Soo Line contends that since no claim was asserted during the WCL Claim Period, Soo Line should be granted summary judgment on WCL's breach of contract claim.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Where, as here, there are cross-motions for summary judgment and "both parties agree on all material facts and the applicable law" but disagree "on the result when the applicable law is applied to the undisputed facts," the case is "ripe for summary judgment." *Walker v. Meyers*, No. 03 C 50028, 2005 WL 17976, at *1 (N.D. Ill. Jan. 3, 2005); *see also Pickett v. Housing Auth. of Cook Cty.*, No. 15-CV-00749, 2017 WL 4281054, at *6 (N.D. Ill. Sept. 27, 2017).

### I. Meaning of the Term "Claim" in the APA

Neither party here denies that a claim for environmental matters has been asserted triggering the APA's indemnification provisions. They simply disagree as to whether the claim for environmental matters was asserted during the WCL Claim Period or during the Soo Line Claim Period. WCL asserts that a claim for environmental matters was first asserted beginning in 1995 with NSP's aggressive efforts to convince WDNR that WCL had contributed to the contamination at Kreher Park. On the other hand, Soo Line contends that a claim was not asserted until the EPA issued its Special Notice Letter in April 2011.

The first question to resolve is whether the APA is ambiguous as to the meaning of the word "claim." The Court looks to Minnesota law in interpreting the APA as the APA contains a

choice-of-law provision stating that Minnesota law governs the interpretation and construction of the contract. (PRSUMF ¶ 23.) Under Minnesota law, "[i]nterpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). And the "terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation." *Id.* Where parties disagree about an undefined contractual term, courts are to give the word its "plain and ordinary meaning." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 67 (Minn. 1979).

While both parties disagree on the precise meaning of the word "claim," that alone does not render the contract ambiguous. *See Staffing Specifix*, 913 N.W.2d at 692 ("A contract's terms are not ambiguous simply because the parties' interpretations differ.") The Court does agree with WCL that "claim" is broader than the definition Soo Line ascribes to it. Soo Line argues that "claim" in the APA requires "a formal legal proceeding, formal legal process, or demand for payment, coupled with the recording of a specific liability on the balance sheet." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 28, Dkt. No. 48.) According to Soo Line, this interpretation follows from the defined contractual term "Three-Year Claims." The APA defines "Three-Year Claims" as:

> claims for environmental matters described in Section 4(a)(v) and (i) actually paid by [WCL] during the period from the Closing Date to the third anniversary of the Closing Date, or (ii) not actually paid by Buyer during such period but the subject of litigation or administrative proceedings or a stipulation, settlement or other similar agreement in respect of threatened litigation or administrative proceedings during such period and recorded as a liability on the balance sheet of [WCL] in accordance with generally accepted accounting principles as of the end of such period, to the extent and only to the extent, of the recorded liability.

(PRSUMF ¶ 15.) Soo Line asserts that this definition provides the best evidence of the meaning of the word "claim" as used elsewhere in the contract because the "three-year" temporal element of the term can be separated out from the remainder of the definition, leaving just "claims."

Specifically, Soo Line believes an unpaid claim derives content by reference to the phrases in clause (ii) of the definition of "Three-Year Claims." In the first place, the definition begins by referencing the exact phrase from the provision of the APA at issue here, "claims for environmental matters described in Section 4(a)(v)," which is separated from the rest of the definition by an "and." Thus, the plain language makes clear that "Three-Year Claims" encompasses a broader term—"claim" as used in "claims for environmental matters"—and then limits its scope by reference to either clause (i) or (ii) following the "and." If "claims for environmental matters" meant only claims that were recorded as a liability on the balance sheet and the subject of a formal legal proceeding—actual or threatened—or settlement, then it would be redundant to include much of the language following the "and" in the definition of "Three-Year Claims." Rather, "Three-Year Claims" could be defined simply to say "claims for environmental matters described in Section 4(a)(v) and actually paid or asserted during the period from the Closing Date to the third anniversary of the Closing Date."

Moreover, the context in which the term "Three-Year Claims" appears in the APA suggests claims that are "Three-Year Claims" are different from undefined claims appearing elsewhere in the APA. The relevant provision in which "Three-Year Claims" is used reads:

> Limitation of Liability. [WCL's] liability under Section 4(a)(v) for Three-Year Claims shall be limited to $10,000,000 in the manner hereinafter provided. [WCL] shall pay the first $10,000,000 due and payable in respect of Three-Year Claims. [WCL] shall not be deemed to have assumed any liability for payment of any amounts in respect of Three-Year Claims in excess of the first $10,000,000 so paid by [WCL] and such amounts in excess of $10,000,000 shall remain the liability of Soo [Line].

(Pl./Counter-Def.'s R. 56.1 Statement of Undisputed Material Facts, Ex. 4 § 4, Dkt. No. 54-4.)

The heart of this provision is the firm $10,000,000 cap on WCL's liability during the specified

period, therefore necessitating the requirement that the claims either be actually paid or, where

prospective, liability can be ascertained and recorded in accordance with generally accepted

accounting principles. Such a limitation on the word "claim" is not necessary when used in the

provisions of the APA at issue here.

Thus, the Court rejects Soo Line's contention that the word "claim" is defined, albeit

indirectly, in the APA. Instead, as required by Minnesota law, the Court will give the word its

plain and ordinary meaning. To do so, the Court first looks to dictionary definitions of the word

claim. *See State v. Thonesavanh*, 904 N.W.2d 432, 436 (Minn. 2017) ("We . . . look to dictionary

definitions to determine the common and ordinary meanings of [undefined] terms."). Black's Law

Dictionary has three definitions relevant here:

> 1. A statement that something yet to be proved is true <claims of torture>. 2. The
> assertion of an existing right; any right to payment or to an equitable remedy, even
> if contingent or provisional <the spouse's claim to half of the lottery winnings>. 3.
> A demand for money, property, or a legal remedy to which one asserts a right; esp.,
> the part of a complaint in a civil action specifying what relief the plaintiff asks
> for.[4]

The Court can dispose of definition 1, as it is far broader than what the contract envisions. A bare

"statement of something yet to be proved" cannot give rise to an obligation to indemnify when it

is not backed up by a concrete legal right. Otherwise, it would give rise to unfettered liability for

all manner of unadorned or baseless statements regarding environmental matters. To adopt this

definition would contravene the Minnesota Supreme Court's instruction to avoid construing

---

[4] Merriam Webster's dictionary defines claim similarly. The relevant definitions are: "a demand for something due or believed to be due;" "a right to something; *specif:* a title to a debt, privilege, or other thing in the possession of another"; and "an assertion open to challenge." ²*Claim*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

contract terms in a way that leads to harsh and absurd results. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). That leaves the Court with definitions 2 or 3, both of which require the assertion of some existing right. The requirement of an existing right finds support from the Minnesota Supreme Court, which has previously defined claim to mean "a ***right*** to demand money," stating that the word "has a broad and comprehensive meaning, embracing every species of ***legal*** demand." *Radichel v. Fed. Sur. Co.*, 212 N.W. 171, 172 (Minn. 1927) (emphasis added). Similarly, when interpreting Minnesota law in the context of an indemnity agreement, the Eighth Circuit concluded that "no claim arises under an indemnity agreement until a specific demand is made for something as a ***legal right*** or until notice of a lawsuit is given." *Jones v. Sun Carriers, Inc.*, 856 F.2d 1091, 1096 (8th Cir. 1988) (emphasis added) (citing *Christy v. Menasha Corp.*, 211 N.W.2d 773, 777 n.2 (1973)).

Based on the plain and ordinary meaning of "claim," the issue before the Court is whether there was any assertion of an existing right during the WCL Claim Period. Specifically, whether NSP asserted an existing legal right when it engaged in its campaign to convince WDNR to designate WCL as a potentially responsible party. WCL apparently agrees that a "claim" under the APA requires the assertion of a legal right and insists that NSP made such an assertion during the WCL Claim Period. (*See* Pl./Counter-Def.'s Reply in Support of Mot. for Summ. J. at 4, Dkt. No. 70.) However, it is clear that NSP was not asserting an existing legal right in its communications with WDNR. Nor was any legal right asserted in NSP's direct communications with WCL in relation to the WDNR investigation. There are numerous facts in the record supporting that conclusion. Indeed, the strongest evidence showing that no existing right was asserted is the fact that, after the expiration of the WCL Claim Period, WDNR notified WCL that it was a potentially responsible party with respect to unrelated solid waste in Kreher Park. In its

letter to WCL, WDNR explicitly disclaimed that it had found that WCL was responsible for the coal tar and creosote contamination at issue here. Five years later, WDNR again confirmed that WCL was a potentially responsible party only with respect to the solid waste. Even after the settlement of the Superfund claims, the WDNR reaffirmed that it had never raised a claim against WCL or Soo Line for the Kreher Park contamination.

Moreover, under the law governing WDNR's investigation, the Wisconsin Spills Act, Wis. Stat. § 292.11(3), a private party ordered by the WDNR to remediate a site neither has a private right of action nor the ability to assert a common law contribution claim against a third party in connection with its own liability. *See Grube v. Daun*, 563 N.W.2d 523, 527–28 (Wis. 1997) (finding that the Wisconsin Spills Act allows the State to seek reimbursement for environmental remediation costs but creates no private right of action); *Foss v. Madison Twentieth Century Theaters, Inc.*, 551 N.W.2d 862, 867 (Wis. Ct. App. 1996) (holding that a responsible party has no common law contribution claim against a third party not named as a responsible party under the Wisconsin Spills Act because the statue does not create common liability among private parties). Yet, WCL contends that there were other existing legal rights that NSP could have asserted against it. Whether or not that is true, to be a claim, the legal right must actually be asserted. *Cf. Taylor v. United Mo. Bank of Kansas City*, 693 F.2d 63, 65 (8th Cir. 1982) ("Under even the broadest definition, a claim requires that one exercise [a] legal right by an affirmative act or demand for payments due."). In addition, the plain terms of the APA create a right to indemnification only for claims for environmental matters that are actually asserted. Thus, the existence of some legal right without any assertion of that right does not constitute an indemnifiable "claim" under the APA. And the uncontested record shows that during the WCL Claim Period, NSP focused its efforts entirely on convincing WDNR to bring WCL into the

Kreher Park cleanup efforts. Thus, while NSP worked to persuade WDNR to assert its legal rights against WCL, WCL points to no evidence showing that NSP even threatened to assert its own legal rights against WCL during the WCL Claim Period.

Absent any nexus with an existing and asserted legal right, NSP's communications with WCL regarding its investigatory findings regarding WCL's potential responsibility for the contamination do not amount to an indemnifiable claim under the APA. Without the force of a potentially responsible party notification from WDNR, NSP's numerous attempts to convince WCL to participate in the remediation were simply invitations to voluntarily contribute before being legally compelled to do so. That falls short of an assertion of a legal right. Indeed, as the Eighth Circuit found when interpreting Minnesota law, "[m]erely discovering facts during the indemnity period that raise the specter of potential claims" does not constitute a claim for indemnification. *Jones*, 856 F.2d at 1091 (finding that no environmental claim existed when the EPA "had merely identified the [contaminated area] as a potential dioxin site").

WCL points to *Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80 (Minn. Ct. App. 2002), as demonstrating that even attempts to induce voluntary participation in remediation efforts can constitute a claim. But *Cargill* is inapposite. That case involved a company, Cargill, that was seeking indemnification under its environmental impairment liability policy for costs it incurred in remediating pesticide contamination. The contamination at issue was identified by the Georgia Department of Natural Resources ("GDNR"). There, the relevant insurance contract defined "claim" as "a demand received by the Insured for money or services." *Id.* at 85. However, Cargill's insurer argued that no claim was stated because GDNR's communications with Cargill regarding the contamination were only "requests for action [and] there was no demand for money or services." *Id.* The state appellate court disagreed, finding that these communications did

constitute claims under the policy. While GDNR's communications were indeed "conciliatory" that was because Georgia law in fact required that GDNR remedy violations of the relevant law through "conference, conciliation, and persuasion." *Id.* However, there was "no indication that Cargill was free to ignore the requests of GDNR" and while "the syntax of the communications did not take the form of demands, their import . . . was undeniably a demand for action." *Id.* Thus, critical to the *Cargill* court's decision was the fact that the GDNR's request for action was backed by the force of law. By contrast, here, NSP asserted no legal ability to compel WCL to participate in cleanup efforts. WCL was free to ignore NSP's communications on the matter.

Similarly, the other cases on which WCL relies for support serve only to reinforce the Court's conclusion that no claim was asserted during the WCL Claim Period. For example, in *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, No. 13-128 (DWF/HB), 2014 WL 4829088 (D. Minn. Sept. 29, 2014), *aff'd by* 796 F.3d 962 (8th Cir. 2015), both the district court and the Eighth Circuit interpreted the undefined term "claim" in an insurance contract to mean "an assertion by a third party that the insured may be liable to it for damages within the risks covered by the Policy." *Ritrama*, 2014 WL 4829088, at *6; *Ritrama*, 796 F.3d at 967. Yet, in explaining why the district court's definition was correct, the Eighth Circuit reaffirmed that the word "claim" entails "some kind of demand or assertion of a legal right." *Ritrama*, 796 F.3d at 968. In the insurance context, the policy itself supplies certain legal rights and so when the insured submits a claim, the insured is making an assertion that the policy affords the insured some right to relief. Several other cases to which WCL cites in support of its contention that "claim" is interpreted broadly also deal with insureds' communications with their insurers and therefore involved the assertion of existing legal rights. *See Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind.*, 639 F.3d 806 (8th Cir. 2011) (holding that insured clinic provided timely notice of its claim under its

"claims-made" policy when it sent a letter to insurer notifying it that one of the clinic's physicians was under investigation for medical malpractice); *Am. Ins. Co. v. St. Jude Med., Inc.*, No. Civ. 08-13 (DSD/JJG), 2010 WL 3733009 (D. Minn. Sept. 20, 2010) (finding that a claim was made during the insurance policy period when medical device company attached a phone log showing that a patient had conducted the company about expenses and compensation related to one of its defective medical devices); *St. Paul Fire & Marine Ins. Co. v. Metro. Urology Clinic, P.A.*, 537 N.W.2d 297 (Minn Ct. App. 1995) (holding that a clinic provided sufficient notice of a claim under the terms of its medical malpractice policy when its office manager called the insurer and informed it of the possibility that a patient would bring a medical malpractice claim).

Finally, the Court's conclusion that NSP did not assert a claim[5] against WCL during the WCL Claim Period is confirmed by WCL's waiver allowing its outside counsel, Michael Best, to represent NSP. The letter expressly stated that the firm could only represent NSP in its interactions with WDNR but not in any cost-recovery or contribution litigation against WCL, and Michael Best affirmed that its representation of NSP would not adversely affect its relationship with WCL. By the very terms of the letter, Michael Best was precluded from asserting a claim on NSP's behalf against WCL. Because the firm was NSP's only outside counsel on the Kreher Park matter, it necessarily follows that NSP could not have been asserting a claim against WCL, otherwise Michael Best would have violated its commitment not to represent NSP in a manner adverse to WCL.

Consequently, because no claim for environmental matters was asserted during the WCL Claim Period, Soo Line did not breach the APA when it failed to indemnify WCL for the sum it paid to settle the Superfund claims. Thus, it is not necessary to address Soo Line's contention that

---

[5] The Court briefly notes that the fact that WCL notified Soo Line of its obligation to indemnify with respect to the Kreher Park contamination in its January 10, 1997 letter did not give rise to any responsibility given that there was no "claim" asserted against WCL at this time.

WCL's breach of contract claim was barred by the running of the statute of limitations.[6] Similarly, the Court need not consider WCL's assertion that the Superfund claims were incident to a claim made during the WCL Claim Period because there was no such claim.

## II. Breach of Contract

Having determined the meaning of the word "claim" in the APA, the Court proceeds to determine whether WCL breached the APA when it refused to indemnify Soo Line. In Minnesota, there are three elements to a breach of contract claim: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).

Here, there is no dispute that the APA is a valid and enforceable contract. As to the second element, Soo Line had to give timely notice of the claim for environmental matters to WCL in order to give rise to WCL's obligation to indemnify. As an initial matter, there must have been a claim asserted during the Soo Line Claim Period. Given the Court's determination that no claim was asserted during the WCL Claim Period and the parties' agreement that there was a claim for environmental matters asserted at some time, it necessarily follows that the claim was asserted during the Soo Line Claim Period. Specifically, there were two claims asserted. The EPA asserted a claim when it issued a Special Notice Letter to Soo Line and WCL on April 27, 2011 advising them that they were potentially responsible parties with respect to the Superfund site. *Cf. Land O'Lakes, Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.*, 846 F. Supp. 2d 1007, 1020 (D. Minn. 2012) (finding that Minnesota adheres to the majority view that a potentially responsible party letter is a

---

[6] WCL filed a motion for leave to file a Surreply to Soo Line's Reply in support of its motion for summary judgment. (Dkt. No. 71.) The Court took that motion under advisement. Because the proposed Surreply is directed only to arguments Soo Line made regarding its statute of limitations defense, WCL's motion for leave to file a Surreply is denied.

"suit" as that term is used in Comprehensive General Liability policies). Then, a second claim was asserted when NSP filed suit against Soo Line and WCL. Each time, Soo Line satisfied the condition precedent as it provided timely written notice to WCL seeking indemnification for the claim. Finally, WCL breached the contract when it twice failed to assume defense of the claim within ten business days after receiving Soo Line's notice.

Soo Line has established that there is no genuine dispute of material fact that APA required WCL to indemnify it for the defense and settlement of the Superfund claims. Having received timely notice of its obligation, WCL's failure to do so was a breach of the APA. Consequently, summary judgment is granted in favor of Soo Line on its counterclaim. In addition, since there is no genuine dispute of material fact that no claim for environmental matters was asserted during the WCL Claim Period, Soo Line had no obligation to indemnify WCL and therefore summary judgment is granted to Soo Line on WCL's claim as well. Correspondingly, WCL's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Soo Line's motion for summary judgment (Dkt. No. 47) is granted and WCL's motion for summary judgment (Dkt. No. 51) is denied.

ENTERED:

Dated: September 30, 2018

Andrea R. Wood
United States District Judge